[Cite as *State v. Deaton*, 2012-Ohio-3496.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO              :

                              :         Appellate Case No. 24838

       Plaintiff-Appellee      :

                              :         Trial Court Case No. 2011-CRB-3289

v.                           :

                              :

WILLIAM DEATON       :         (Criminal Appeal from Dayton

                              :         Municipal Court)

       Defendant-Appellant   :

                              :

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of August, 2012.

. . . . . . . . . . .

JOHN DANISH, Atty. Reg. #0046639, and STEPHANIE L. COOK, Atty. Reg. #0067101, by
EBONY N. WREH, Atty. Reg. #0080629, Dayton Municipal Prosecutor's Office, 335 West
Third Street, room 372, Dayton, Ohio 45402
       Attorney for Plaintiff-Appellee

TARA C. DANCING, Atty. Reg. #0077277, Tara C. Dancing LLC, 1158 Kauffman Avenue,
Fairborn, Ohio 45324
       Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant William H. Deaton appeals from his conviction

and sentence for Aggravated Menacing. Deaton contends that the trial court violated his constitutional right, under the Sixth Amendment to the Constitution of the United States, and under Article I, Section 10 of the Ohio Constitution, to confront the witnesses against him when it sustained objections to questions he put to the complaining witness designed to elicit her ability to perceive and remember events accurately.

{¶ 2} The State contends that the trial court properly sustained its objections to these questions, because Evid. R. 607(B) required that counsel have a reasonable basis for asking them, and counsel did not demonstrate a reasonable basis.

{¶ 3} We conclude that the State construes the restriction in Evid. R. 607(B) too broadly. It only imposes the restriction on questions pertaining to impeachment that imply the existence of an impeaching fact. The questions counsel put to the witness did not imply the existence of an impeaching fact. Therefore, Evid. R. 607(B) had no application, and Deaton had a right to inquire concerning the witness's ability to perceive and remember events accurately. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

{¶ 4} Deaton also contends that the trial court erred when it limited the scope of his cross-examination of the complaining witness concerning prior dealings between Deaton and his family and the witness and her family, which would demonstrate the witness's bias against Deaton. We conclude that the trial court did not abuse its discretion. The prior incidents between the two families had been explored to the point that it was obvious that Deaton and the complaining witness harbored ill-feelings toward one another. The trial court could reasonably conclude that further exploration of those matters would serve to hijack the

trial of the charge of Aggravated Menacing by making it a trial of all the bones of contention between the two families.

### I. Deaton and Heather Turner Confront One Another

{¶ 5} Deaton and Heather Turner lived just three houses away from one another. They did not speak to one another, and Turner described their relationship as "unfriendly."

{¶ 6} One morning in late October, 2010, Deaton reported to the Dayton Police that he had been assaulted by the boyfriend of Turner's sister, Robert Kennedy. That afternoon, Turner was driving towards her home when she saw Deaton walking. Deaton looked at her. He was yelling and screaming, but Turner did not know what he was saying

{¶ 7} Turner decided to go around the block to her sister's home, but her sister was not at home. She then went to Kennedy's house and parked in a rear alley. Turner testified what then happened:

> I seen Mr. Deaton coming down the alley[,] and I was talking to someone to ask if my sister was there[,] because I could I could tell that there was going to be trouble. He comes up to my car. He reaches in my car. He call me a c*nt and says that he's going to kill me and Robert. He call me a b*tch.

{¶ 8} Turner told Deaton "two or three times" to get out of her car window. She thought he was going to hit her. When he finally did get out of her car window, she left, went home, and called the police to report the incident.

{¶ 9} Turner testified that later, Deaton "was yelling that he was going to call

the Ku Klux Klan and it was never going to be over." She testified that in front of the police officer he used the same cuss words. Dayton Police Officer John Beall corroborated that when he spoke to Deaton, Deaton was agitated, said it was not over, and that he would be calling the Ku Klux Klan. Beall did not know whether Turner overheard Deaton's comments to him.

{¶ 10} Deaton testified in his own defense. According to him, Turner initiated the contact in the alley, started cussing him, and said that his "f*cking daughter set her [daughter's] car on fire." According to Deaton, he never leaned into Turner's car window, and never threatened her, although he did admit to having leaned down and said to Turner, "that she's a lying f*cking b*tch[,] and tell Mr. Kennedy that he had better crawl under a rock and die."

## II. The Course of Proceedings

{¶ 11} Deaton was arrested and charged with Aggravated Menacing.

{¶ 12} During Turner's cross-examination, the following colloquys occurred:

Q: Have you taken any prescription drugs in the last fourty-eight [sic] hours?

THE STATE: Objection.

THE COURT: Sustained.

THE DEFENSE: I'm trying to make sure that she is of sound mind to testify in this court today.

THE COURT: The court would sustain the objection.

Q: Is there anything that would alter your perception of what's going on in this

courtroom today?

A: No.

THE STATE: Objection.

THE COURT: The answer will stay.

Q: Were you on any medication at the time of the occurance [sic]? Anything that might affect your memory or perception of things going on?

THE STATE: Objection.

THE COURT: Sustained.

THE DEFENSE: These are cognitive memories.

* * *

Q: And you said to him [Deaton] I quote, "Get out of my car."

A: Right, yes.

Q: That's it. No expletives, no rage, just get out of my car.

A: I think I said, "Get the f*ck out of my car."

Q: OK, that's better. You talked about some broken windows?

A: Yeah.

Q: You have no idea who broke your windows, do you?

A: Yeah, I do. Yes, I do.

Q: Did you see somebody?

A: I seen the person walk away from the car, but because I didn't actually see her break the window, they can't do nothing.

Q: So, it was a her that broke the window?

A: No, it was his daughter.

Q: Have you blamed anyone else for this?

A: No ...

Q: For breaking your windows, you haven't?

A: No.

Q: No.

A: I've heard from a parent's mom that she did it and then I heard from her mom that the other kid did it, so I don't know.

Q: So, you have no idea.

A: She's got it on her My Space and sent me an e-mail saying she broke my window.

Q: Speaking of My Space ...   Actually, never mind.   There's no reason for that.   You said that you've known the Deatons for roughly three years maybe?

A: Yes.

Q: Conflict the whole time?

A: No.

Q: No.

A: Nope.

Q: The conflict started when?

A: My daughter got pregnant and quite [sic] hanging out with their daughter.

Q: How about a date?

A: I don't have a date.

Q: You don't know the date that your daughter got pregnant?   I don't need a

conception date. Have just nine months minus whatever, that's fine with me. When was your daughter's kid born?

A: March.

Q: ? [sic]

A: . [sic]

THE STATE: Your Honor, I'm going to object. I don't think ...

THE COURT: Sustained, the question and the answer are striken [sic].

Q: I was learning more, I'm sorry. So there would no reason [sic] for you to go to mitigation [sic] in 2009?

A: Her daughter assaulted me. Mr. Deaton's daughter assaulted me.

Q: 2011 to 2009, that's two full years ago and there obviously had to be an incident way before that in order to get to the mediation status, right?

A: The only incident that got us to mediation was her assaulting me.

Q: You didn't jump on her on her eighteenth birthday?

A: No, it's all over her My Space that she was waiting for me to be up.

Q: Did you bring any of that good stuff with you?

A: No.

THE STATE: Your Honor ...

THE COURT: I'm going to have to interrupt her Mr. Hollencamp, I think that we've established there is some previous dealings but we're not going to try those matters today.

THE DEFENSE: OK.

THE STATE: Thank you, Your Honor.

[Whereupon, defense counsel moved on to other subjects.]

{¶ 13} Following a bench trial, Deaton was convicted of Aggravated Menacing. He was sentenced to 90 days in the Montgomery County Jail, with all 90 days suspended on certain conditions. Deaton was also fined $100 and was ordered to pay court costs. From his conviction and sentence, Deaton appeals.

## II. The Trial Court Did Not Err in Limiting the Scope of Deaton's Cross-Examination of the Complaining Witness on the Issue of Bias

{¶ 14} Deaton's sole assignment of error is as follows: "THE TRIAL COURT VIOLATED WILLIAM DEATON'S CONSTITUTIONAL CONFRONTATION RIGHT BY LIMITING HIS CROSS EXAMINATION OF THE VICTIM."

{¶ 15} One argument Deaton makes is that the trial court improperly limited that part of his cross-examination in which he sought to demonstrate the bias of the complaining witness. It is clear from the second colloquy quoted at paragraph 12, above, that Deaton was able to cross-examine Turner at some length concerning the feud festering between her family and Deaton's family. The trial court, as the finder of fact, cannot have been in any doubt that there were mutual feelings of hostility between Turner and Deaton.

{¶ 16} When the trial court sustained the State's objection, it noted that "some previous dealings" between the complaining witness and Deaton had been established, but that "we're not going to try those matters today." In our view this was not an abuse of discretion. To have permitted the cross-examination to continue to inquire into the history of bad

relations between the two families would have allowed this trial of an Aggravated Menacing charge to be expanded into a trial of all the contentious issues between Turner and her family and Deaton and his family. The trial court wisely decided not to allow it.

**III. The Trial Court Did Err in Limiting Deaton's Opportunity to Cross-Examine the Complaining Witness on Her Ability to Perceive and Remember Facts Accurately**

{¶ 17} Deaton also argues in support of his assignment of error that he should have been permitted to inquire concerning the ability of the complaining witness to perceive and remember events accurately. Specifically, he was not allowed to inquire whether Turner was using prescription drugs within the 48 hours preceding her testifying at the trial, or whether she was using medication at the time of the altercation with Deaton "that might affect your memory or perception of things going on." He was allowed to inquire whether there was anything that would alter Turner's perception of what was taking place in the courtroom during her testimony, to which Turner responded in the negative.

{¶ 18} The trial court did not provide any explanation for its rulings.

{¶ 19} The State acknowledges that Evid. R. 616(B) permits evidence of a defect of capacity, ability, or opportunity to observe, remember, or relate, to be shown to impeach a witness. But the State argues that this ability to impeach is limited by Evid. R. 607(B), which provides as follows: "A questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." The State argues that because Deaton had no reasonable basis to believe that Turner was impaired, either at the time of the altercation, or at the time of her testimony at trial, the trial court properly

sustained the State's objection.

{¶ 20} Evid. R. 607(B) does not require a reasonable basis for any question pertaining to impeachment. It requires a reasonable basis for questions pertaining to impeachment "that impl[y] the existence of an impeaching fact." The staff notes to Evid. R. 607(B) contain the following explanation of this requirement:

> Note that the requirement of a good faith basis applies only when the cross-examiner is effectively asserting in the form of a question the truth of a factual statement included within the question. If the cross-examiner is merely inquiring whether something is or is not true, a good faith basis is not required. Thus the question, "Your glasses were being repaired at the time of the accident, weren't they?" requires a good faith basis, while the question, "Were you wearing your glasses at the time of the accident?" does not.

> 1 Graham, Handbook of Federal Evidence § 607.2, at 679-80 (4th ed. 1996).

{¶ 21} The questions Deaton put to Turner are of the permitted kind. Deaton asked Turner whether she had taken any prescription drugs within the 48 hours preceding her testimony. This question does not imply that Turner was taking prescription drugs. Similarly, Deaton asked Turner whether she was taking any medication at the time of the altercation that might have affected her memory or perception. This question, also, does not imply that Turner was taking any medication at the time; it merely asks if she was.

{¶ 22} Deaton had no way to take Turner's deposition before trial, or otherwise to determine whether Turner was taking prescription drugs at either time. Deaton could have attempted to interview Turner before trial, but given the history of hostility between them, it is

not likely that Turner would have agreed to do so. Realistically, the only way for Deaton to find out if Turner was on medications that might have affected her perception or memory was to ask Turner, under oath. These questions were permitted under Evid. R. 616(B), and were not prohibited under Evid. R. 607(B), because they were not questions that implied the existence of an impeaching fact.

{¶ 23} The State cites *State v. Edwards*, 8th Dist. Cuyahoga No. 87587, 2006-Ohio-5726. The opinion in that case does not state what the question was, but it does state that the question implied the existence of an impeaching fact, which would be prohibited by Evid. R. 607(B).

{¶ 24} The State next cites *State v. Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175. In that case, the defendant was permitted to establish that the witness was under psychiatric care and was taking medication. The defendant was also permitted to ask the witness whether these medications affected the ability of the witness to perceive the events concerning which she testified. The trial court sustained an objection to inquiry into the specific condition for which the witness was taking the medication, after the trial court had satisfied itself that the condition was not relevant to the ability of the witness to perceive and to relate events. *Id.*, ¶ 40-41. *Totarella* is readily distinguishable from the case before us, in which Deaton was not allowed to ask the witness whether she was taking any prescription drugs that might have affected her perception or memory.

{¶ 25} In *State v. Dennis*, 3rd Dist. Marion No. 9-95-9, 1995 WL 695091 (Nov. 22, 1995), another case cited by the State, the court of appeals upheld the trial court's having sustained an objection to an inquiry into whether the complaining witness had been taking any

prescribed drugs on the night of the incident, finding that there was no good-faith basis for the question because urinalysis of the complaining witness disclosed the use of alcohol and marijuana or hashish, but not prescription drugs or medications. Since the use of prescription drugs had been ruled out by forensic evidence, we conclude that *Dennis* is distinguishable, but to the extent that it is not distinguishable, we do not find it persuasive.

{¶ 26} Finally, the State cites *State v. Ramirez*, 10th Dist. Franklin No. 01AP-859, 2002-Ohio-4298. In that case, the court of appeals found that the trial court had not erred in sustaining an objection to an inquiry whether a witness had been hospitalized as a result of his mental health. The trial court based its holding upon the fact that an insufficient basis of good-faith had been shown for the question. The precise form of the question was not quoted in the opinion, so we cannot be sure that it did not imply the impeaching fact – that the witness had been hospitalized. Furthermore, the witness had answered "no" to the question before the objection was sustained, which arguably mooted the analysis. In any event, to the extent that *Ramirez* stands for the proposition that *any* question pertaining to impeachment must be supported by a reasonable basis for the question, we find it unpersuasive.

{¶ 27} Because we conclude that the questions Deaton put to Turner concerning her use of medication at the time of the altercation and at the time of the trial were permitted by Evid. R. 616(B), and were not precluded by Evid. R. 607(B), we conclude that the trial court went outside its discretion when it did not permit them. Because the Confrontation Clause of the Sixth Amendment to the United States Constitution is implicated, we would have to find this error harmless beyond a reasonable doubt. We cannot do so. This was essentially a trial that came down to which witness the trial court found more credible – the complaining

witness, or the defendant. We cannot find, beyond reasonable doubt, that the result of the trial would have been the same had Deaton been permitted to ask Turner about medications she may have been taking.

{¶ 28} Deaton's sole assignment of error is sustained.


## IV. Conclusion

{¶ 29} Deaton's sole assignment of error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

. . . . . . . . . . . . .

GRADY, P.J., and CUNNINGHAM, J., concur.

(Hon. Penelope R. Cunningham, First District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).


Copies mailed to:

John Danish / Stephanie L. Cook
Ebony N. Wreh
Tara C. Dancing
Hon. John S. Pickrel